UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA     ) | |
|                                                            ) | |
|            v.                                            ) | Cr. No. 19-173 (RC) |
|                                                            ) | |
| KEVIN JOSEPH FOTI,                    ) | |
|                                                            ) | |
|            Defendant.                          ) | |

## SENTENCING MEMORANDUM

Mr. Foti, through undersigned counsel, respectfully submits this memorandum requesting that the Court consider his entire life and the various legal arguments made in this sentencing memorandum in determining a fair and just sentence.

### Background

On May 16, 2019, Mr. Foti visited the office of Senator John Thune of South Dakota at his senate office building in Washington, D.C.  *See* Complaint, ECF #1, pg. 1.  Mr. Foti provided his contact information, including his cell phone number.  According to staff members of Senator Thune, Mr. Foti appeared to be talking to himself as well as other individuals who were not present.  *Id.*  The reason Mr. Foti went to the office of Senator Thune was because Mr. Foti believed he needed help with regard to a lawsuit that was filed in South Dakota.

The next day on May 17, 2019, Mr. Foti made a phone call to the Senator's office following up on the previous day's visit and his attempt to meet with the Senator.  During this phone call he identified himself, and his cell phone number was the same as the one provided the previous day.  Mr. Foti expressed an urgency to speak with the Senator and if no one responded "death warrants" would be signed and that he would "shoot up the office."  *Id.*

Law enforcement was then contacted who then tracked down Mr. Foti via cell site data later that afternoon. *Id.* Mr. Foti complied with law enforcement and he was arrested for the threatening behavior and charged via complaint with 18 U.S.C. § 115(a)(1)(B), Threatening to Assault a United States Official, or a United States government employee in the performance of their official duties; and 22 D.C. Code § 1810, Threatening to Injure a Person. *Id*.

On May 20, 2019, Mr. Foti made his initial appearance before Magistrate Judge Harvey at which time a competency screening was ordered. Thereafter, Dr. Teresa Grant completed her assessment of Mr. Foti's competency and opined that Mr. Foti was not competent to proceed. *See* ECF #9.

On May 22, 2019, the grand jury returned an indictment charging Mr. Foti with the same two offenses outlined in the criminal complaint. *See* ECF # 7.

On June 3, 2019, a further competency evaluation was ordered by Magistrate Judge Harvey and Mr. Foti was transferred to MCC in Chicago for further evaluation. *See* ECF #14. Thereafter, in September 2019, the parties received the Competency Evaluation, which concluded that Mr. Foti had "a factual understanding of the nature and consequences of the proceedings against him, his ongoing, fixed delusional beliefs and disorganized thinking are preventing him from rationally understanding the proceedings against him or meaningfully assisting in preparing his defense." *See* ECF # 28, pg. 10. On September 10, 2019, neither party contested the findings of the Competency Evaluation and thus Magistrate Judge Harvey ordered restoration proceedings pursuant to 18 U.S.C. § 4241(d)(1). *See* ECF #29. Further, because of significant delays in transportation within the BOP, Magistrate Judge Harvey ordered that status reports be provided by the government about the transfer of Mr. Foti for restoration. *See* ECF

#30, #32, #33, #34.  Ultimately, on December 5, 2019, almost 3 months after the Order was issued, Mr. Foti arrived at FMC Fort Worth, Texas.[1]  *See* ECF #34.

In mid-March 2020, the world changed and COVID-19 became a worldwide pandemic.  Mr. Foti's evaluation was completed during this time and ultimately on May 5, 2020, the parties received the Forensic Report.  See ECF #38.  In light of the information contained in the Forensic Report, on May 15, 2020, an unopposed motion was filed requesting that a pre-plea offense level calculation and criminal history report be prepared by the probation office to assist in discussions about resolving this via a guilty plea.  *See* ECF #41.  On May 19, 2020, this Court ordered that the probation office submit their report no later than July 24, 2020.  *See* Minute Order, dated 5/19/20.

On July 23, 2020, the probation office submitted its report.  *See* ECF #45.  According to the report, the applicable base offense level is 12 pursuant to U.S.S.G. § 2A6.1(a)(1).  *Id*. at ¶ 2, pg. 2.  A four level reduction is applicable because the offense involved little or no deliberation pursuant to U.S.S.G. § 2A6.1(b)(6).  *Id*. at ¶ 3, pg. 2.  Further, a six level increase is warranted because the victim was a government employee of Senator Thune and the offense of conviction was motivated by such status pursuant to U.S.S.G. § 3A1.2(b).

These guideline calculations for the offense conduct are the very same guidelines outlined in the plea agreement offered by the government, with the exception that because Mr. Foti will be entering a guilty plea a two level reduction for acceptance of responsibility will

---

[1] Mr. Foti remains detained at FMC Fort Worth, Texas.  The parties have been in communication with officials at that location whereby there had been an understanding that in light of COVID-19 and other factors, Mr. Foti would remain there until the hearings set in this case for September 17, 2020.  Mr. Foti will therefore be participating in these hearings remotely and agrees to his appearance virtually.

apply pursuant to U.S.S.G. § 3E1.1.  *See* Plea Agreement, pg. 3.[2]  Therefore, the parties agree that a total offense level of 12 applies.  *Id.* and *also see* ECF #45, footnote #1, pg. 2.

Further, the probation report calculated his criminal history score which resulted in eight criminal history points due to his prior convictions.  *See* ECF #45, ¶ 48, pg. 30.  However, the report also adds two additional points to his criminal history calculation because it appears that Mr. Foti was on probation for an offense that was committed in 2011.  *See* ECF #45, ¶ 43, pg. 27 and ¶ 49, pg. 30.  Therefore, the total criminal history score is ten, resulting in criminal history category V.  *See* ECF #45, ¶ 50, pg. 30.

Based upon a total offense level of 12, coupled with a criminal history category V, the resulting guideline range is 27 to 33 months.  *See* Plea Agreement, pg. 3.  According to the terms of the plea agreement, neither party can seek a departure from this guideline range; however, Mr. Foti has the right to seek a sentence below the calculated guideline range pursuant to 18 U.S.C. § 3553(a).  Further, the government has agreed to cap its allocution at 27 months.  *Id*. at pg. 4.  Notwithstanding the guideline calculations and consistent with the terms of the plea agreement, Mr. Foti is seeking a sentence of time served, approximately 16 months, followed by a 30 day term of supervised release.

The parties are scheduled to appear before Magistrate Judge Harvey on September 15, 2020 for Mr. Foti's competency hearing.  It is anticipated at that hearing the parties will agree that Mr. Foti is competent to proceed and request that his case be set for a consolidated plea and sentencing hearing before this Court on September 17, 2020.

---

[2]  A copy of the plea agreement, statement of offense, and waiver of trial by jury form have been executed by the parties and they have been tendered to this Court's courtroom deputy.

On September 17, 2020, Mr. Foti intends to plead guilty to Count One of the Indictment which charges him with Threatening to Assault and Murder Senator John Thune and Employees of his Office, in violation of 18 U.S.C. § 115(a)(1)(B).  Upon acceptance of his guilty plea, Mr. Foti requests that his case proceed to sentencing and thereby waives the submission of a full PreSentence Report.  Between the information contained in the various forensic reports, as well as the information contained in the probation office's pre-plea and criminal history calculation report, the parties respectfully submit that the Court can proceed to sentencing as requested.  *See* ECF #38 & #45.

## ARGUMENT

Section 3582 of Title 18 provides:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, **recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.**  (Emphasis added).

With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph [(a)](2) [of § 3553]."  18 U.S.C. § 3553(a).

When sentencing a defendant, the Court "may not presume that the Guidelines range is reasonable."  *Gall v. United States*, 552 U.S. 38, 49-51 (2007).  Rather, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the court to consider.  *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).  Once the Court correctly calculates the sentence that the Guidelines recommend, the Court must then "make an individualized assessment," considering the remaining factors set forth in § 3553(a).  *Gall*, 552 U.S. at 50.

5

Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it. *Rita v. United States*, 551 U.S. 338, 348, 350 (2007). Consequently, this Court must "filter the Guidelines' general advice through § 3553(a)'s list of factors." *Id*. at 358; *see also Gall*, 552 U.S. at 52 ("'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996))). Indeed, sentencing has been aptly described:

> Of course, each defendant must be assessed on his or her own terms: courts are not machine presses and sentences are not widgets to be churned out on some criminal justice conveyor belt. But a properly calculated guidelines sentence provides useful data, a "starting point" or "initial benchmark," even as it remains the judge's duty to tailor every sentence to the case and defendant at hand.

*United States v. Sabillon-Umana*, 772 F.3d 1328, 1330 (10th Cir. 2014) (Gorsuch, J.) Ultimately, this Court must make an "individualized judgment about the case at hand." *Id.* at 1331.

The D.C. Circuit has emphasized "that the Guidelines are truly *advisory*." *United States v. Gardinelli*, 545 F.3d 1089, 1096 (D.C. Cir. 2008) (emphasis in original). The Court in *Gardinelli* noted that the Supreme Court's decision in *Gall* gave "district judges *even more* discretion and authority." *Id.* (emphasis in original). Indeed, the Court in *Gardinelli* pointed out that in *Gall* the Court affirmed a probationary sentence for a defendant whose guidelines range was 30 to 37 months. *Id.* at 1095.

I.  **The History and Characteristics of Mr. Foti Warrant a Sentence of Time Served**

Mr. Foti is a 60 year old U.S. veteran with a long-standing history of mental health issues, substance abuse, and homelessness. As evidenced by all the physicians that have evaluated Mr. Foti during the pendency of this case, he has been diagnosed with schizoaffective disorder, bipolar type; mild neurocognitive disorder, and stimulant use disorder. Of the most critical components of this case is that at the time Mr. Foti committed the offense, his judgment was significantly impaired due to his mental illness.

Mr. Foti respectfully submits that this Court can consider the mental and emotional conditions he was enduring when the criminal conduct occurred. U.S.S.G. § 5H1.3 provides that "[m]ental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. §5H1.3. The provision further provides that "a downward departure may be appropriate to accomplish a specific treatment purpose." *Id*. (citing U.S.S.G. §5C1.1, app. n. 7). Mr. Foti is not requesting a downward departure pursuant to the terms of the plea agreement, rather he respectfully submits consideration of his mental and physical health under 18 U.S.S.C. § 3553(a) as to why his mental health conditions should be considered in imposing a sentence of time served.

Importantly, as the Forensic Report from Fort Worth, Texas states, a MRI of Mr. Foti's brain was taken in February 2020. *See* ECF #38, pg. 14. The results of the MRI noted "mild diffuse brain atrophy" and the underlying cause of his brain atrophy is likely "dementia." *Id*. Despite these unsettling findings, Mr. Foti was able to discuss his current diagnosis and comply with his prescribed medication regime. Ultimately, Mr. Foti's medication changes have

7

positively impacted his thinking, participation in his case, and his reasoned decision to enter a guilty plea in this case.

## II. This Court Should Grant Mr. Foti a Variance to Account for his Overstated Criminal History Category

Under the Sentencing Guidelines, when a "defendant's criminal history category significantly over-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes," a downward departure is warranted. *See* U.S.S.G. § 4A1.3(b)(1); and *United States v. Beckham*, 968 F.2d 47, 53-54 (D.C. Cir. 1992) (recognizing downward departure where accused criminal history over-represents the seriousness of past criminal conduct and the likelihood of recidivism). Consistent with the terms of the plea agreement, Mr. Foti is not requesting a downward departure pursuant to U.S.S.G. § 4A1.3, rather submitting a variance argument that his placement in Criminal History Category V overstates his record.

In determining whether to grant a downward departure under U.S.S.G. § 4A1.3 or a variance under 18 U.S.C. § 3553, courts should compare the defendant's criminal history with others who occupy the same criminal history category. *See* U.S.S.G. § 4A1.3. When making a comparison in the instant case, it is clear that the Criminal History Category of V assigned to Mr. Foti significantly over-represents the seriousness of his criminal history because it includes a two point increase from an offense that occurred in Colorado in 2011 that was already revoked in 2016. While Mr. Foti does not contest the information contained in the probation report, he respectfully submits that a total of four points for this offense overstates his criminal history score. Importantly, Mr. Foti left the state of Colorado after that conviction and the warrant, while active, is "serviceable only within the State of Colorado." See ECF #45, ¶ 43, pgs. 27-28.

While properly counted for criminal history category computation purposes in light of the fact that it appears that his Colorado probation term was active at the time the offense conduct occurred in this case, this Court can consider the entire record in this case. If these two points were not added to his criminal history calculation, Mr. Foti would be placed in criminal history category IV. Based upon a criminal history calculation of IV and a total offense level of 12, the resulting guideline range is 21 to 27 months. Therefore, Mr. Foti respectfully submits that this Court consider his criminal history category in the context of other individuals who are also placed in criminal history category V.

### III. The Need for the Sentence Imposed

18 U.S.C. § 3553(a) directs the Court to consider four objectives of federal sentencing to impose a sentence that is "sufficient, but not greater than necessary" to achieve those goals. The first purpose is to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Mr. Foti accepts responsibility for his conduct and understands the seriousness of his offense.

Another purpose of sentencing is to "afford adequate deterrence." *Id.* at § 3553(a)(2)(B). While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence shows that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice (May 2016) at 1-2. Research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original). Significantly, "the crime prevention benefit falls far short of the social and economic

costs," *id.* at 2, especially in light of the fact that U.S. Sentencing Commission "research has demonstrated that reductions to sentence length and time served do not harm public safety," *Transforming Prisons, Restoring Lives*, Charles Colson Task Force on Federal Corrections, Urban Inst. (Jan. 2016) at 21.  *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardoza J. Conflict Resolution 421, 447-48 (2007) ("Certainty of punishment is empirically known to be a far better deterrent than its severity.").

In addition to deterrence, this Court should consider the need to protect the public from further crimes by Mr. Foti.  Because Mr. Foti is currently 60 years old, it is highly unlikely that Mr. Foti will engage in future criminal activity.  Under the guidelines, age was not normally relevant to sentencing; however, several courts and the sentencing commission itself have noted that recidivism drops substantially with age.  *See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12, 28 (2004), [www.ussc.gov/publicat/Recidivism_General.pdf](www.ussc.gov/publicat/Recidivism_General.pdf)  ("recidivism rates decline relatively consistently as age increases," from 35.5% for under age 21 to 9.5% over 50).  "The Guidelines' failure to account for this phenomenon renders it an imperfect measure of how well a sentence protects the public from further crimes" of a particular defendant.  *Simon v. United States*, 361 F. Supp.2d 35, 40 (E.D.N.Y. 2005).  A number of courts have considered this as a factor in sentencing defendants below the advisory guidelines range.  *See United States v. Wadena*, 470 F.3d 735, 740 (8th Cir. 2006) (where 67 year old defendant convicted of mail fraud and guidelines suggested sentence of 18 to 24 months, proper for district court to impose probation because "Wadena's age and recent deterioration in her health reduce the risk of re-offending"); *United States v. Lucania*, 379 F. Supp. 2d 288, 297 (E.D.N.Y. 2005) ("Post *Booker* courts have

noted that recidivism is markedly lower for older defendants."); *United States v. Carmona-Rodriguez*, 2005 WL 840464, at *4 (S.D.N.Y. April 11, 2005) (court imposed lesser sentence because defendant was older (55) and thus there was a lower probability of recidivism). Further, recidivism rates decline with age. *See* USSC, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, Ex. 9 (2004), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

In addition, the OIG reviewed the criminal history of a random sample of aging inmates "who were released from BOP custody between FY 2006 and FY 2010" and found that only 15 percent "were re-arrested for new crimes within 3 years of their release," and that "the re-arrest of aging inmates within [the] sample generally declined with age." *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, U.S. Dept. of Justice 10 (May 2015), pgs. 38-40, found at https://oig.justice.gov/reports/2015/e1505.pdf  For example, "34 of 181 released inmates (19 percent) age 50 to 54 were re-arrested for a new crime compared to no re-arrests for released inmates age 70 and older." *Id.* at 39.

In a December 2017 report from the U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, age and criminal history exerted a strong influence on recidivism. *See* https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders  For offenders in Criminal History Category I, the rearrest rate ranged from 53.0 percent for offenders younger than age 30 at the time of release to 11.3 percent for offenders age 60 or older. *Id.*  Older offenders were less likely to recidivate after release than younger offenders who had served similar sentences, regardless of the length of sentence imposed. *Id.*

A sentenced of time served – approximately 16 months of incarceration, which have involved 5 separate correctional facilities - is significant and just punishment in this case. While this Court may have concerns about protecting the public from reckless behavior, incarceration is not necessary to serve this purpose. Mr. Foti is now on medication and addressing his mental health which clearly contributed to the offense conduct in this case.

### IV.     COVID-19 and Its Impact on Mr. Foti and his Conditions of Confinement

The advent of the Coronavirus pandemic has affected sentencing decisions in a profound way. As this Court is well-aware, 18 U.S.C. § 3553(a) "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)); *see also Holguin-Hernandez*, 140 S. Ct. 762, 766 (2020). With COVID-19, it is necessary to examine this statutory provision in a more deliberate way. The further incarceration of Mr. Foti, who has extremely limited access to communication, programming, and rehabilitative resources and faces enormous risk to his health is not necessary to meet the goals of sentencing. 18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." As such, as part of its sentencing obligations, this Court must consider the need for the sentence imposed to "provide just punishment for the offense." COVID-19 is one factor the Court should consider. Because of COVID-19, Mr. Foti has spent almost the last 6 months essentially in lockdown conditions similar to solitary confinement, subjected to the constant fear of contracting a deadly disease. He will continue to face these struggles if any further period of incarceration is imposed.

Since March 13, 2020, BOP modified its operations to respond to the spread of COVID-19 and individuals in every institution" are "secured in their assigned cells/quarters to decrease the spread of the virus. Family and friends are prohibited from visiting. Programming, absent select UNICOR operations, has ceased and movement throughout the facilities is suspended. And while BOP's website claims movement exceptions are made to permit showers three times a week, telephone and email access, commissary, and laundry, in reality even these most basic activities are not allowed, and instead, conditions amount to a total lockdown for almost twenty-four hours a day. See Fed. Bureau of Prisons, *Fed. Bureau of Prisons COVID-19 Action Plan* (Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp (Phase II). Phase II's modified operations were extended as described in Phase III, Phase IV, Phase V, Phase VI, and Phase VII. Institution lockdown commenced on April 1, 2020 (Phase V) and was subsequently extended through May 18, 2020, (Phase VI) and again through June 30, 2020 (Phase VII). And, at some facilities, once someone tests positive for the virus, they are put in solitary confinement. *See, e.g.*, Class Action Complaint, *Torres v. Milusnic*, No. 20-cv-04450 (C.D. Cal. May 16, 2020), ECF No. 1, at 55 (Declaration of Joanna Perales) (petitioner placed in Special Housing Unit (SHU) after testing positive for COVID-19); Class Action Petition for Writ of Habeas Corpus, *Hallinan v. Scarantino*, No. 20-hc- 2088-FL (E.D.N.C. May 26, 2020), ECF No. 1-4, at 6 (Declaration of Roger Duane Goodwin) (Petitioner in FCI Butner Medium I moved to the SHU after testing positive for COVID-19). *See also* Fed. Bureau of Prisons, *BOP Implementing Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited September 9, 2020).

Of particular note is that the facility where Mr. Foti is currently detained – FMC, Fort Worth, Texas – has had 12 inmate deaths due to COVID-19. *See*

https://www.bop.gov/coronavirus/ (last visited September 9, 2020).  As of September 9, 2020, BOP reports that at FMC Fort Worth, there are 23 inmates that have tested positive; 9 staff members that have tested positive; and 12 inmate deaths.  *Id.*  There are 574 inmates that have recovered from the virus and 6 staff members have recovered from the virus.  *Id.*

Conditions within the BOP have fueled the spread of COVID-19 throughout BOP facilities—numerous deaths have occurred and most of those tested within the BOP have the virus.  Thus, because of COVID-19, Mr. Foti's confinement has been more severe than it ordinarily would.  See e.g., https://www.forbes.com/sites/walterpavlo/2020/07/16/bureau-of-prisons-using-solitary-confinement-as-a-means-to-curb-covid-19-contagion/#685159f193ad  Therefore, this Court should account for the oppressive nature of BOP confinement by sentencing Mr. Foti to time served.

Under 18 U.S.C. § 3553(a)(2)(D) this Court must also consider "the need for the sentence imposed—. . . to provide the defendant with needed. . . medical care. . . in the most effective manner."  Surely in the middle of a pandemic that is taxing the medical resources of the BOP and communities in which the BOP facilities are located, this is not served by further incarceration.  Even under the best of circumstances, the BOP has struggled to provide medical care.  In 2016, for example, DOJ's Office of Inspector General (OIG) found that BOP experienced chronic medical staffing shortages and failed to take adequate measures to address them, endangering the safety and security of its institutions.  *See, e.g.,* U.S. Dep't of Justice Office of the Inspector Gen., *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* i-ii, 1-2 (Mar. 2016), https://oig.justice.gov/reports/2016/e1602.pdf.  From 2010 to 2014, BOP's total medical staff was "approximately 17 percent less than what the BOP projected was necessary to provide what it considers to be 'ideal' care," and 12 institutions were so

medically understaffed that they were described as "crisis level." Id.  Lack of adequate staffing has resulted in medical personnel and other non-correctional staff working as guards, and has made wait times for individuals to receive even routine medical care unacceptably long. Unfortunately, as COVID-19 ravages its facilities, BOP's ability to provide effective medical care has only gotten worse.  *See* Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests How the U.S. is Failing Federal Inmates as Coronavirus Hits*, Vice (Mar. 24, 2020), https://bit.ly/3eq7Rl7; *see also* Oversight of the Federal Bureau of Prisons and Implementation of the First Step Act of 2018: Hearing before the Subcomm. On Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary, 115th Cong. 3-4 (2019) (statement of Kathleen Hawk Sawyer), https://bit.ly/2ZJlDeG.

Finally, Congress directed in 28 U.S.C. § 994(g)*,* that the Commission "take into account the nature and capacity of the penal, correctional, and other facilities and services available" and that "the sentencing guidelines . . . shall be formulated to minimize the likelihood that the Federal prison population will exceed the capacity of Federal prisons."  Despite this obligation, BOP facilities have historically been, and remain, overcrowded.  Adding COVID-19 to the mix has resulted in prisons and jails that are even more dangerous, inhumane, and deadly than before. BOP is simply not equipped to handle this global pandemic. Courts have called BOP's COVID-19 response "an outrage" and "Kafkaesque," confirming that "BOP is struggling to handle this crisis within its prison population."  Congress has similarly recognized BOP's failed capacity. On March 27, 2020, Congress passed the CARES Act and authorized the Attorney General to increase the use of home confinement.   And before and after the passage of CARES, Congress has repeatedly called on DOJ and BOP to drastically depopulate its prisons and jails. *See, e.g.*, Letter from U.S. Rep. Jerrold Nadler, Chairman Comm. on the Judiciary to Hon. William P.

Barr, U.S. Atty. Gen. (Mar. 12, 2020), https://bit.ly/2THldRS ("it would be important, at this time, for DOJ to consider measures that can be taken to reduce the number of prisoners in government custody"); Letter from U.S. Sen. Kamala Harris to Michael Carvajal, Dir., Fed. Bureau of Prisons (Mar. 19, 2020, https://bit.ly/2zA7eGR ("in the midst of this crisis, BOP should be taking reasonable steps to reduce the incarcerated population and guard against potential exposure to coronavirus"); Press release, U.S. Sens. Chuck Grassley & Dick Durbin, *Grassley, Durbin Statement Following Phone Call with Attorney General Regarding Federal Prison System Efforts to Combat COVID-19* (May 6, 2020), https://bit.ly/2Xz29qi ("The senators have urged the use of home confinement. . . to protect vulnerable inmates."); Letter from U.S. Sens. Elizabeth Warren, Edward J. Markey & Lori Trahan to Michael Carvajal, Dir., Fed. Bureau of Prisons (May 15, 2020), https://bit.ly/3erL2gG ("it is critical that the BOP depopulate prisons to the maximum extent safely possible").

Even DOJ and BOP understand that they are unable to care for the incarcerated population under these circumstances. Albeit belatedly and with questionable guidance, Attorney General Barr issued two memorandums to the BOP, directing BOP to increase the use of home confinement. BOP similarly issued guidance to its officers, acknowledging that "it has become imperative to review at-risk inmates for home confinement." *See* Mem. from Hon. William P. Barr, U.S. Atty. Gen. to Michael Carvajal, Dir., Fed. Bureau of Prisons 1 (Mar. 26, 2020), https://politi.co/3dblYL0 ; Mem. from Hon. William P. Barr, U.S. Atty. Gen. to Michael Carvajal, Dir., Fed. Bureau of Prisons (Apr. 3, 2020), https://bit.ly/3ciP5eV. Unfortunately, BOP has remained unwilling and unable to effectively use this mechanism to depopulate.

By sentencing Mr. Foti to a term of time served, this sentence will contribute to the review of 'at-risk' inmates and lower the prison population by one person at FMC Fort Worth where 12 inmates have already died.

## **CONCLUSION**

A sentence of time served, approximately 16 months incarceration, is a serious consequence that will more than adequately punish Mr. Foti for his particular conduct and will also adequately deter any future wrongful conduct. Thus, for the reasons stated above, including Mr. Foti's history and characteristics, together with the other goals of sentencing, Mr. Foti respectfully requests that the Court impose a sentence of time served followed by a 30-day term of supervised release.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
Dani Jahn
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500